# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 04-1071 & 04-1096

JAMES A. BAKER, RAYMOND WOLFE and
WILLIAM PATE, on behalf of themselves
and all others similarly situated,

       *Plaintiffs-Appellants, Cross-Appellees*,

       *v.*


ALFRED D. KINGSLEY, DAVID D. JONES, JR.,
ROBERT L. FIX, *et al.*,

       *Defendants-Appellees, Cross-Appellants.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 1750—**Robert W. Gettleman**, *Judge.*

_____

ARGUED SEPTEMBER 15, 2004—DECIDED OCTOBER 27, 2004

_____


Before FLAUM, *Chief Judge*, and COFFEY and KANNE,
*Circuit Judges*.

FLAUM, *Chief Judge*. Plaintiffs-appellants, individually
and on behalf of all others similarly situated, initiated this
suit in Illinois state court alleging that defendants-appellees
violated the Illinois Wage Payment and Collection Act
("Illinois Wage Act"), 820 ILCS § 115/5. Defendants removed

the case to the United States District Court for the Northern District of Illinois, citing as the basis for the court's jurisdiction the complete preemption of plaintiffs' claim by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Thereafter, plaintiffs amended their complaint, adding a claim for breach of fiduciary duty in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1022 and 1104. The district court then granted defendants' motion to dismiss plaintiffs' ERISA claim, held that the Illinois Wage Act claim was not preempted by the LMRA, and remanded the case to state court. Plaintiffs now appeal the dismissal of the ERISA claim and defendants cross-appeal the remand order. For the reasons stated herein, we reverse and remand for further proceedings consistent with this opinion.

## I.  Background

Plaintiffs-appellants were employees of Outboard Marine Corporation ("OMC") in its Waukegan, Illinois, manufacturing and production facility. According to their second amended complaint, on or about September 11, 1997, defendant Greenmarine Holdings, LLC completed a takeover of OMC and installed the individually named defendants as directors.

In September 1999, defendants anticipated having to close OMC's Waukegan plant over a two-year period as part of the takeover. Because the then-existing collective bargaining agreement with the International Marine and Machinists Association ("IMMA") was set to expire in October 1999, defendants negotiated an extension of the agreement ("Shutdown Agreement") by promising to pay IMMA members, including the named plaintiffs, certain severance and retention wage supplements if they worked to the end of the Shutdown Agreement, or until the actual shutdown of the Waukegan plant.

The Waukegan plant closed on December 21, 2000, and OMC filed for bankruptcy the following day. In the aftermath, OMC terminated its employee health plan and failed to pay the wage supplements provided for in the Shutdown Agreement.

Plaintiffs' first claim alleges that defendants' failure to pay the Shutdown Agreement's wage supplements violated the Illinois Wage Act. In their second claim, plaintiffs allege that defendants violated their fiduciary duty under ERISA by failing to notify plaintiffs of the likely termination of the OMC Health Plan and by failing to fund the plan. This appeal follows the district court's order dismissing the ERISA claim and remanding the Illinois Wage Act claim.

## II. Discussion

### A. Appellate Jurisdiction

We first must decide whether we have appellate jurisdiction over the parties' cross-appeals. The only challenge to our jurisdiction comes from plaintiffs-appellants who assert that 28 U.S.C. § 1447(d) precludes the exercise of appellate jurisdiction over defendants' cross-appeal of the remand of the Illinois Wage Act claim. Nevertheless, we have an independent duty to determine that jurisdiction exists before we can proceed to the merits of either appeal. *See ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 235 F.3d 360, 363 (7th Cir. 2000).

Our general appellate jurisdiction derives from 28 U.S.C. § 1291, which provides in relevant part: "The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States." "Whether a decision is final for purposes of § 1291 generally depends on whether the decision by the district court 'ends the litigation on the merits and leaves nothing for the court to

do but execute the judgment.'" *ITOFCA*, 235 F.3d at 363 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978)).

The "final decision" requirement of § 1291 restricts piecemeal appeals. *See id.* Ordinarily, a party is precluded from appealing a district court's order resolving some but not all of the claims in a case. *See United States v. Ettrick Wood Prods., Inc.*, 916 F.2d 1211, 1217 (7th Cir. 1990). Where, however, a district court has resolved all federal claims and has remanded the remaining claims to state court, we have appellate jurisdiction to review the federal claims, the district court having nothing of the matter left on its docket. *See, e.g.*, *Hileman v. Maze*, 367 F.3d 694, 696 (7th Cir. 2004) (reviewing dismissal of federal claims where district court declined to retain jurisdiction over state-law claims); *McCullah v. Gadert*, 344 F.3d 655, 656 (7th Cir. 2003) (same). The district court's order dismissed plaintiffs' ERISA claim and remanded the Illinois Wage Act claim, leaving it with nothing to do but enter judgment on the former. Accordingly, the dismissal of the ERISA claim is an appealable "final decision."

A remand order that marks the end of litigation in federal court, like the order issued in this case, is also a "final decision." *See Kircher v. Putnam Funds Trust*, 373 F.3d 847, 848 (7th Cir. 2004) (citing *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 711-15 (1996)). There is, however, an additional obstacle to appellate jurisdiction over remand orders. The general grant of appellate jurisdiction in 28 U.S.C. § 1291 is limited by § 1447(d), which states in relevant part: "An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise." Apart from a specific exception for civil rights cases, the language of § 1447(d) is unqualified and would seem to suggest that the courts of appeals lack jurisdiction over all remand orders. As we have explained before, however, the Supreme Court has read § 1447, the statute governing removals and

remands, as a whole and has interpreted the limitation on appellate jurisdiction in subsection (d) in relation to the reasons for remand set forth in subsection (c). *See Adkins v. Ill. Cent. R.R. Co.*, 326 F.3d 828, 831 (7th Cir. 2003) (discussing *Thermtron Prods., Inc. v. Hermansdorfer*, 423 U.S. 336 (1976), *abrogated on different ground by Quackenbush*, 517 U.S. 706); *Kircher*, 373 F.3d at 848-49 (same).

In its first case dealing with the issue, the Supreme Court held that "only remand orders issued under § 1447(c) and invoking the grounds specified therein that removal was improvident and without jurisdiction are immune from review under § 1447(d)." *Thermtron*, 423 U.S. at 346. The Court phrased its statement of the rule in this way to reflect the language of § 1447(c), which permitted remand "[i]f at any time before final judgment it appears that the case was removed improvidently and without jurisdiction." In 1988, Congress amended § 1447(c) to permit remand when "it appears that the district court lacks subject matter jurisdiction" or when a defect in removal procedure is raised in a motion to remand within 30 days of removal. *See* Judicial Improvements and Access to Justice Act, Pub. L. No. 100-702, Title X, § 1016(c), 102 Stat. 4642 (Nov. 19, 1988). Accordingly, the Supreme Court's next statement of the scope of § 1447(d) reflected the language of the amended statute: "As long as a district court's remand is based on a timely raised defect in removal procedure or on lack of subject-matter jurisdiction—the grounds for remand recognized by § 1447(c)—a court of appeals lacks jurisdiction to entertain an appeal of the remand order under § 1447(d)." *Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 127-28 (1995).

In an important case revealing the limits of the *Thermtron* rule, the Supreme Court addressed a split among the circuits as to "whether a district court has discretion to remand a removed case to state court when all federal-law claims have dropped out of the action and only pendent state-law

claims remain." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 348 (1988).[1] Though the question came to the Court on appeal from a remand order, the Court reached the merits of the appeal without doubting the circuit court's, or its own, appellate jurisdiction. *See id.* at 345-57; *see also Rothner v. City of Chicago*, 879 F.2d 1402, 1409 (7th Cir. 1989) (noting that the majority and dissent in *Carnegie-Mellon* agreed that the remand order was reviewable).

In accordance with this case law, our appellate review is barred by § 1447(d) only as to "remands based on grounds specified in § 1447(c)." *Things Remembered*, 516 U.S. at 127, *quoted in Benson v. Si Handling Sys., Inc.*, 188 F.3d 780, 782 (7th Cir. 1999). Stated obversely, if a district court's remand is based on a ground other than a timely raised defect in removal procedure or lack of subject-matter jurisdiction—i.e., the discretionary exercise of the power to decline supplemental jurisdiction pursuant to § 1367—then §1447(d) does not affect our § 1291 appellate jurisdiction.

We recently applied this rule in *Adkins v. Illinois Central Railroad Company*, 326 F.3d 828 (7th Cir. 2003). There, the plaintiffs filed suit in state court alleging several state-law claims against non-diverse defendants. One of the defendants removed the case, arguing that the state-law claims were completely preempted by the federal Locomotive Inspection Act. Later, one of the defendants filed a third-party complaint against Amtrak, a federal instrumentality. The district court initially accepted the "complete preemption" argument and concluded that removal was proper, based on

---

[1] *Carnegie-Mellon* was decided before the passage in 1990 of 28 U.S.C. § 1367, which expressly authorized district courts to decline to exercise supplemental jurisdiction over a state-law claim if all claims within the court's original jurisdiction had been dismissed. *See* Judicial Improvements Act of 1990, Pub. L. 101-650, Title III, § 310, 104 Stat. 5089 (Dec. 1, 1990).

the presence of a federal question (and, implicitly, supplemental jurisdiction over the remaining claims). The court then dismissed on preemption grounds all claims that the plaintiffs had asserted against the removing defendant. Finally, finding that none of the other defendants was arguing that complete preemption created federal question jurisdiction, the court concluded that the case must be remanded to state court for lack of jurisdiction. *See Adkins*, 326 F.3d at 830.

We recognized in *Adkins* that the district court's remand order was not entirely clear with respect to its own jurisdiction and was subject to at least two interpretations. The order could be regarded as based on the district court's conclusion that it never had jurisdiction over the remaining claims because there was no federal question. Though we noted that the district court may have made a mistake in not recognizing its supplemental jurisdiction under § 1367, we concluded that such a mistake "does not defeat the bar found in § 1447(d)." *Id.* at 833. Similarly, the fact that the "district court did not *think* that Amtrak saved its jurisdiction," even if this belief was erroneous, rendered the order unreviewable. *Id.* at 834 (emphasis in original).

We went on to find in *Adkins* that the district court's order was subject to an alternative reading, namely, that it believed that it continued to have jurisdiction over the case, but that remand was appropriate for some other reason, such as a discretionary exercise of the power to decline supplemental jurisdiction. We explained that if this latter reading was correct, "then our appellate jurisdiction would be secure and we would have to consider the merits of the district court's decision." *Adkins*, 326 F.3d at 834. Based on this alternative interpretation of the district court's order, we considered the merits of the remand and concluded that the Locomotive Inspection Act did not completely preempt the plaintiffs' state-law claims. *Id.* at 835.

Section 1447(d), as construed in the decisions of the Supreme Court and this Circuit, is not a bar to appellate

review of the district court's remand order in this case. As in *Adkins*, the order is not entirely clear as to jurisdiction. It might be read as based on a determination by the court that, after dismissal of the ERISA claim, no basis remained for jurisdiction over the Illinois Wage Act claim. Alternatively, the order can be read to reflect the court's belief that it had jurisdiction over the case after dismissing the ERISA claim, but that the remand was appropriate as a discretionary exercise of its power to decline supplemental jurisdiction. Appellate review is unavailable under the first reading, but is permitted under the second.

In its order, the district court dismissed plaintiffs' ERISA claim, held that the Illinois Wage Act claim was not preempted by the LMRA, and then stated, "the court notes that there remains no basis for exercising federal jurisdiction over the instant dispute, which consists solely of plaintiff[s'] Wage Act claim." Though this tends to support the first interpretation, a thorough examination of the order as a whole persuades us that the second interpretation is correct.

First, the district court stated that it had decided to remand "[r]ather than reach the merits of defendants' remaining arguments [for dismissal]." This phrasing suggests a recognition that retaining supplemental jurisdiction was an available option. Second, the court stated that it "need not reach the merits of defendants' other arguments in support of dismissal" of the Illinois Wage Act claim. The use of "need not," rather than "may not" or "cannot," again suggests that the court was aware of its discretion under § 1367. Finally, the court, having decided to remand, went on to quash service as to defendant Katz. In doing so, it must have intended to exercise supplemental jurisdiction. If the district court believed that its finding of no preemption divested it of jurisdiction over the claim, it would have gone no further than remanding the case as to defendant Katz as well. Having determined that there is no statutory basis for its subject matter jurisdiction, a district court, which is a court of

limited jurisdiction, should proceed no further than deter-
mining whether to dismiss or transfer the case. *Cf. Sheldon
v. Sill*, 49 U.S. (8 How.) 441, 449 (1850) ("Courts created by
statute can have no jurisdiction but such as the statute
confers.").

We conclude that the district court, having dismissed the
ERISA claim, believed that it retained supplemental juris-
diction over the state-law claim and exercised its discretion
to remand it. Our appellate jurisdiction to review this order
is firmly established. *See Carnegie-Mellon*, 484 U.S. at 345-
57; *Adkins*, 326 F.3d at 834; *see also Kircher*, 373 F.3d at
850 ("District courts should relinquish supplemental
jurisdiction under certain circumstances, remanding to state
court if the suit originated there. 28 U.S.C. §§ 1367(c), 1441(c).
We know from *Carnegie-Mellon* that § 1447(d) does not
foreclose review of such a remand.").

At oral argument, plaintiffs ultimately conceded that the
district court had supplemental jurisdiction over the Illinois
Wage Act claim, noting simply that the district court had
"decline[d] to take it." Plaintiffs argued, however, that our
appellate jurisdiction extends only to review of the district
court's decision to decline supplemental jurisdiction, but not
to its preemption determination. We disagree. Review of the
district court's exercise of discretion in declining supplemen-
tal jurisdiction *necessarily* entails review of its decision on
preemption.

Section 1367(a) provides: "[I]n any civil action of which
the district courts have original jurisdiction, the district
courts shall have supplemental jurisdiction over all other
claims that are so related to claims in the action within
such original jurisdiction that they form part of the same
case or controversy under Article III of the United States
Constitution." Section 1367(c)(3) grants district courts au-
thority to decline to exercise supplemental jurisdiction and
remand a case "if . . . the district court has dismissed all

claims over which it has original jurisdiction." Accordingly, the authority to remand pursuant to § 1367 extends only to claims that are not within the district court's original jurisdiction. *See Adkins*, 326 F.3d at 847-48 (Ripple, J., dissenting); *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 787 (3rd Cir. 1995) ("nothing in § 1367(c) authorizes a district court to decline to entertain a claim over which is has original jurisdiction"); *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 542 (8th Cir. 1996) ("A district court has no discretion to remand a claim that states a federal question."); *In re City of Mobile*, 75 F.3d 605, 607 (11th Cir. 1996) ("Section 1367(c) cannot be fairly read as bestowing on district courts the discretion to remand to a state court a case that includes a properly removed federal claim."). It is an abuse of discretion for a district court to remand a federal claim that is properly before it.

Even if our appellate jurisdiction extends only to review of the district court's decision to decline supplemental jurisdiction, which we do not here hold, we must review the district court's preemption decision to determine whether it had original jurisdiction over the Illinois Wage Act claim. If the claim is preempted by § 301 of the LMRA, then it was within the district court's original jurisdiction and to remand it was an abuse of discretion. Thus, whether or not our appellate jurisdiction is limited as plaintiffs suggest, we must complete the preemption analysis to determine whether it was within the district court's power to remand.

## B.  Illinois Wage Act Claim

Having established that we have appellate jurisdiction over the district court's remand order, we review de novo its determination that plaintiffs' Illinois Wage Act claim is not preempted by § 301 of the LMRA. *See Tifft v. Commonwealth Edison Co.*, 366 F.3d 513, 516 (7th Cir. 2004) (citing *Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 987 (7th Cir. 2000)).

Section 301 provides: "Suits for violation of contracts between an employer and a labor organization representing employees . . . may be brought in any district court of the United States having jurisdiction of the parties." 29 U.S.C. § 185(a). The Supreme Court has construed the preemptive force of § 301 to be "so powerful as to displace entirely any state cause of action for violation of contracts between an employer and a labor organization." *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 23 (1983) (internal quotations omitted), *quoted in Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 7 (2003). "Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301." *Id.*

Even where a plaintiff relies on state law in a complaint and makes no mention of § 301, the federal statute will displace the state-law claim to ensure uniform interpretation of collective bargaining agreements. *See Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 498 (7th Cir. 1996). The Supreme Court has cautioned, however, that "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985), *quoted in In re Bentz Metal Prods. Co., Inc.*, 253 F.3d 283, 286 (7th Cir. 2001) (en banc). To determine whether a state-law claim is preempted, we must look at the "legal character" of the claim: a "question of state law, entirely independent of any understanding embodied in the collective bargaining agreement," may go forward as a state-law claim, *Livadas v. Bradshaw*, 512 U.S. 107, 124-25 (1994); whereas a claim, the resolution of which "is sufficiently dependent on an interpretation of the CBA," will be preempted. *Bentz Metal*, 253 F.3d at 286. If a state-law claim requires reference to, but not interpretation of, a collective bargaining agreement, the claim is not preempted. *Id.* at 285.

Defendants argue that plaintiffs' Illinois Wage Act claim is preempted by § 301 of the LMRA. The Wage Act provides: "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILCS § 115/5. Plaintiffs' complaint alleges that defendants violated the Act by failing to pay IMMA members the Shutdown Agreement's wage supplements following closure of the Waukegan plant.

In *Metalcrafters v. McNeil*, 784 F.2d 817 (7th Cir. 1986), we considered whether a similar claim under the Illinois Wage Act was preempted by § 301 of the LMRA. There, the union alleged that the employer had violated the Illinois Wage Act by failing to pay vacation benefits and argued that the claim merely required application of an unequivocal term in the collective bargaining agreement. The collective bargaining agreement, however, did not explicitly provide for the vesting of the vacation benefits under the circumstances of the case.

We reasoned that deciding whether an employer has honored its contract and complied with the Act, "requires interpreting the contract, unless, perhaps, the particular contractual provision is so clear as to preclude all possible dispute over its meaning." *McNeil*, 784 F.2d at 824. Because the employees' entitlement to the vacation benefits was "fairly debatable," we held that the claim required interpretation of the collective bargaining agreement and, therefore, was preempted by § 301 of the LMRA. *See id.* at 824-25 (quoting *Allis-Chalmers*, 471 U.S. at 219 n.13).

After *McNeil*, the Supreme Court considered a claim under a California law similar to the Illinois Wage Act. *See Livadas*, 512 U.S. 107. In *Livadas*, a supermarket employee, who had been working under a collective bargaining agreement, demanded immediate payment of earned wages upon her discharge, as required by the California law. The store

manager refused, referring to a company policy of mailing payments from a central payroll office. Though the employee received a check for the correct amount three days later, she alleged that her employer was liable for a statutory penalty of a sum equal to three days' wages for the delay between her discharge and the date the payment was received. *Livadas*, 512 U.S. at 110-11.

The Supreme Court determined that, because there was no dispute between the parties as to the amount of three days' wages, or therefore the amount of the statutory penalty, there was no need to interpret the collective bargaining agreement. According to the Court, the claim primarily required reference to a calendar, and thus it found the collective bargaining agreement to be "irrelevant" to the dispute apart from "the simple need to refer to bargained-for wage rates in computing the penalty." *Livadas*, 512 U.S. at 125. The Court held that the claim was not preempted.

Though *Livadas* cautioned against finding preemption where reference to the collective bargaining agreement is needed only for computation of damages, it did not undermine our analysis in *McNeil* or the rule that § 301 provides the exclusive cause of action for contract disputes under collective bargaining agreements. The holding of *Livadas* applies only "when the meaning of contract terms is not the subject of dispute." *Livadas*, 512 U.S. at 124; *see also Atchley*, 101 F.3d at 500 (finding preemption of a claim brought under an Indiana wage payment law which required interpretation of the collective bargaining agreement to determine whether, and on what date, the employer had an obligation to pay wage increases and bonuses).

Under *McNeil* and *Livadas*, we hold that the LMRA preempts plaintiffs' Illinois Wage Act claim. Sections 18(a) and 19(a) of the Shutdown Agreement require that the retention and severance wage supplements be paid to "Waukegan Plant Bargaining Unit employees covered by this Agreement

whose employment with the Company is terminated or who are permanently laid off, pursuant to Section 8(I)(b) of this Agreement." Defendants argue that eligibility for wage supplements under the Shutdown Agreement, and thus liability under the Illinois Wage Act, turns on whether plaintiffs were terminated or permanently laid off "pursuant to Section 8(I)(b)." Section 8(I)(b) refers to employees who are laid off or terminated "due to the transfer or relocation of work . . . to other OMC facilities, subcontracting of work to outside companies . . . , subcontracting of work to subcontractors to perform bargaining unit work within the plant . . . , and/or the consolidation or discontinuance of operations."

Sections 18(a) and 19(a), by their explicit reference to § 8(I)(b), necessarily exclude employees terminated or permanently laid off pursuant to § 8(I)(c), according to defendants' argument. The latter subsection refers to layoffs and terminations "due to the sale of all or substantially all of the assets of the Waukegan Plant." Defendants argue that the sale of assets in a bankruptcy proceeding could be interpreted to fall within § 8(I)(c) rather than § 8(I)(b) and that, therefore, the Shutdown Agreement excludes from entitlement to the wage supplements employees terminated due to bankruptcy. This interpretation of the Shutdown Agreement may or may not be correct, an issue on which we do not comment, but it is at least tenable. To determine plaintiffs' entitlement to the wage supplements, a court would have to interpret, not merely reference, these provisions of the Shutdown Agreement. Accordingly, the claim is preempted by § 301 of the LMRA.

Plaintiffs raise three arguments in response to defendants' proposed interpretation of the Shutdown Agreement. First, to show that liability for the wage supplements is uncontested, plaintiffs point to OMC's failure to contest its liability before the bankruptcy court. Even if this could be deemed an admission or a waiver by OMC, defendants are not bound by the litigation choices of a distinct entity.

Second, plaintiffs assert that defendants' interpretation of the Shutdown Agreement is "spurious" because "[l]ayoffs are layoffs." Plaintiffs' counter-position, however, merely lends support to the conclusion that contractual interpretation is required. Because defendants' interpretation is plausible, and demonstrates a genuine dispute between the parties that can affect liability, it is a sufficient basis for preemption.

Finally, plaintiffs argue that defendants' failure to present this interpretation of the Shutdown Agreement to the district court results in forfeiture of the argument. Though the district court did not address this issue of contract interpretation in its order, defendants' motion and reply briefs filed with the district court both referred to the need for interpretation of §§ 18 and 19 of the Shutdown Agreement and the reply explicitly argued that the district court would need to determine "whether and how, if at all, the sale of assets in bankruptcy affects the calculation of severance payments under applicable sections of the Shutdown CBA. (*See id.* §§ 8(I)(b)-(c), 19 and 20(a))." This was sufficient to preserve the issue.

The resolution of plaintiffs' Illinois Wage Act claim requires interpretation of the Shutdown Agreement. Accordingly, the claim, even though presented under state law, is a § 301 claim under the LMRA. In light of the complete preemptive power of § 301, the claim arises under federal law and remand was improper. *See Tifft*, 366 F.3d at 516 (citing 28 U.S.C. §§ 1331, 1441(a)). Upon remand from this Court, the district court shall consider defendants' arguments in favor of dismissal of the § 301 claim.[2]

---

[2] Defendants urge us to rule on the merits of the § 301 claim, but, because the district court has not had an opportunity to address the arguments for dismissal, we decline to do so at this time.

### C. ERISA Claim

Plaintiffs' complaint alleges that defendants breached their fiduciary duty under ERISA. The district court dismissed the claim, holding that defendants could not be ERISA fiduciaries under the facts alleged. Accepting as true all well-pleaded factual allegations and drawing all reasonable inferences in plaintiffs' favor, we review de novo whether plaintiffs' complaint states a claim for which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6); *McCullah v. Gadert*, 344 F.3d 655, 657 (7th Cir. 2003).

A claim for breach of fiduciary duty under ERISA is only valid against a "fiduciary." *Plumb v. Fluid Pump Serv., Inc.*, 124 F.3d 849, 854 (7th Cir. 1997). A person is a fiduciary with respect to an ERISA plan, "to the extent [ ] he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). Because a person is deemed a fiduciary only "to the extent" he or she exercises discretionary authority, "a person may be an ERISA fiduciary for some purposes, but not for others." *Plumb*, 124 F.3d at 854 (citations omitted). "In assessing whether a person can be held liable for breach of fiduciary duty, a court must ask whether [that] person is a fiduciary with respect to the particular activity at issue." *Id.* (internal quotations omitted).

Plaintiffs' complaint alleges that defendants violated §§ 102 and 404 of ERISA in two ways: (1) by failing to provide "reasonable advance notice" of the termination of the OMC Health Plan so that plaintiffs could avoid a break in coverage; and (2) by failing to fund the OMC Health Plan. We must determine first whether these are cognizable duties under ERISA, and second whether defendants can be fiduciaries with respect to these two particular activities under the facts alleged.

In addressing whether there was a duty to provide notice of the future termination of the OMC Health Plan, the district court explained that on February 20, 2001, OMC filed a motion in the bankruptcy court to approve defendants' termination of the plan pursuant to 11 U.S.C. §§ 1113 and 1114. Thereafter, the unions, including the IMMA, asked for a delay of 120 days in any termination of the plan to permit participants to seek group coverage. The bankruptcy court denied this request and granted OMC's motion for termination in its entirety, authorizing and directing the debtors to terminate their medical plans "as soon as reasonably practicable." From this, the district court concluded that "the notice, or dearth thereof, afforded participants of the plan's termination was not a matter of the exercise of discretionary authority on the part of the defendants, and cannot be characterized as a breach of fiduciary duty." The district court held that, to the extent plaintiffs' ERISA claim is based on inadequate notice regarding the termination of the plan, it fails to state a claim upon which relief can be granted.

Plaintiffs argue that the district court misunderstood the complaint and that it does not allege that the *termination* of the plan violated a fiduciary duty. Rather, plaintiffs argue that the alleged breach occurred long before the bankruptcy court issued its order. Plaintiffs point to paragraphs 77 through 81 of the second amended complaint, wherein they allege the following: by late 2000, defendants knew that OMC was faltering and that there was a "significant risk that the OMC Health Plan would be terminated"; defendants did not warn plaintiffs of this "significant risk" or that defendants might exercise their right to terminate the plan without notice; defendants failed to so warn plaintiffs because they did not wish to alarm creditors of OMC; defendants breached their fiduciary duty to the extent they put the interests of OMC and Greenmarine ahead of plaintiffs' interests; and plaintiffs could have obtained

group health insurance had they been given reasonable advance notice of the likely termination of the plan.

Defendants respond that this theory of liability must fail as a matter of law because there is no fiduciary duty owed to plan participants in terminating a plan, and it follows that there is never a fiduciary duty to inform plan participants of a risk of plan termination. The premise of defendants' argument is firmly established. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996); *Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184, 1188 (7th Cir. 1994). Defendants' broad conclusion, however, does not necessarily follow.

The Supreme Court has held that an employer breaches its fiduciary duty by lying to employees in order to induce them to surrender their benefits. *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996). In interpreting the limits of this holding, several Circuits have held that there is no fiduciary duty to inform plan participants of a future risk. *See Sprague v. General Motors Corp.*, 133 F.3d 388, 406 (6th Cir. 1988) ("We are not aware of any court of appeals decision imposing fiduciary liability for a failure to disclose information that is not required to be disclosed. At least three circuits have held that there is no fiduciary duty to disclose planned changes in benefits or even the termination of the plan before those actions become official. *Pocchia v. NYNEX Corp.*, 81 F.3d 275, 278 (2d Cir. 1996); *Payonk v. HMW Indus., Inc.*, 883 F.2d 221, 229 (3d Cir. 1989); *Stanton v. Gulf Oil Corp.*, 792 F.2d 432, 435 (4th Cir. 1986). *A fortiori*, there can be no fiduciary duty to disclose the possibility of a future change in benefits.").

We reached the same conclusion in *Vallone v. CNA Financial Corporation*, 375 F.3d 623 (7th Cir. 2004). There, the plaintiffs alleged a breach of fiduciary duty in the defendant's failure to warn plan participants of the possibility that benefits would be terminated. We observed that "[i]n this circuit, a breach of fiduciary duty exists if fiduci-

aries 'mislead plan participants or misrepresent the terms or administration of a plan.'" *Vallone*, 375 F.3d at 640 (quoting *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir. 1993)). Nevertheless, we held that "the lack of a specific warning that welfare benefits are terminable would not alone create a breach of fiduciary duty." *Id.* at 642. We affirmed the district court's grant of summary judgment in favor of the defendants, explaining that "the employer must have set out to disadvantage or deceive its employees, as in *Varity*, in order for a breach of fiduciary duty to be made out" and finding that there was no evidence of such an intent to deceive. *Id.* at 642.

Although there is no fiduciary duty under ERISA to disclose the likelihood of a future termination of a plan, under *Varity*, the same may not be true where the employer intentionally misleads the plan participants about the future of the plan, through statements *or* omissions. Plaintiffs allege that defendants "directly and indirectly, continued to give good assessments of OMC's prospects, even after these defendants knew that the company was likely to fail and that there was a significant risk the OMC Health Plan would be terminated," and that defendants failed to disclose the imminent termination to plaintiffs "at least in part because they did not wish to alarm creditors of OMC."

We hold that these vague allegations of "assessments" of the general economic well-being of an employer, especially in the absence of specific allegations of intent to deceive, are not sufficient to state a claim for breach of fiduciary duty under ERISA. Under the facts alleged, the failure to disclose the likelihood of bankruptcy and plan termination may have been an innocent byproduct of the company's efforts to keep from its creditors and competitors information it had no duty to disclose. Furthermore, if we were to create a new fiduciary duty, as plaintiffs request, we run the risk of disturbing the carefully delineated corporate disclosure

laws. We decline to do so here, where there is no well-pleaded allegation of intent to deceive the plan participants.

As to notice, plaintiffs also argue that it was a breach of fiduciary duty under 29 U.S.C. § 1022, to fail to notify plaintiffs in the summary plan description ("SPD") of the risk that their health benefits could be terminated without notice. Section 1022 provides that the summary plan description shall include the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits" and "shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations." 29 U.S.C. § 1022. The parties agree that the SPD provided to plaintiffs states that coverage will end "when the Plan is terminated by the Company." Though the plan states that the employer "shall have the right to terminate the Plan without notice to the Participants or their Dependants," this additional language does not appear in the SPD.

We conclude that the SPD's firm and unqualified statement that termination of the plan by the company will end coverage, is sufficient to satisfy § 1022 because it reasonably apprises plan participants of a circumstance which will result in loss of benefits. *See Mers v. Marriott Int'l Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014, 1024 (7th Cir. 1998). The SPD does not encourage the plan participants to incorrectly assume that they would receive notice of the plan's termination and it is sufficient to alert participants of the need to inquire further to determine if there were any conditions for termination. It was unnecessary to state explicitly in the SPD what is already suggested, namely, that the company may terminate the plan without more.

Plaintiffs also allege that defendants violated § 404 of ERISA by failing to fund the OMC Health Plan. Section 404 provides: "[A] fiduciary shall discharge his duties with

respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(1)(A). Plaintiffs allege that defendants breached their fiduciary duty by failing to provide long term funding to the plan, relying on articles X and XI of the plan as the source of the duty. Article X, entitled "Plan Financing," includes the following provisions:

> The Employer shall make contributions in such amounts and at such times as determined by the Company in accordance with a funding method and policy consistent with Plan objectives.

> All contributions under this Plan shall be paid to the Trustee. All assets of the Trust Fund, including investment income, shall be retained for the exclusive benefit of Participants and their beneficiaries . . . and shall not revert to or inure to the benefit of the Employer.

Plaintiffs argue that this reveals "an intent that the Plan should be set up as a trust, with assets, and not operate on a pay as you go basis" and that "[t]hough it is peculiar to use 'Employer' and 'Company' in the same sentence in this way, the intent is that the 'Company' as fiduciary will fix and collect the amounts due from the 'Employer,' so as to carry out the objective of creating a trust, with assets, and a secure basis of funding." Though defendants dispute that there was any obligation to fund the plan within its terms, they have not demonstrated that plaintiffs' interpretation of the plan's language is incorrect as a matter of law. Drawing all reasonable inferences in plaintiffs' favor, we find that there is a cognizable duty under the specific language of this plan, such that plaintiffs' claim should not be dismissed at this early stage.

The final step in our analysis is to determine whether the district court was correct to conclude as a matter of law that

defendants were not fiduciaries with respect to funding the
plan. The district court cited § 11.6 of the plan which
provides:

> The assets of this Plan shall be invested by a
> "Management Committee." The "Management Commit-
> tee" shall be appointed by and serve at the pleasure of
> the Board of Directors of the Company to assist in the
> investment of the assets of this Plan. Such persons may
> be the Company's Vice President and Treasurer, Vice-
> President of Human Resources and the Director of
> Employee Benefits . . . . The Management Committee
> shall have full power and authority to invest and
> reinvest the assets of the Plan.

Relying on this language, the district court concluded that
"[a]lthough section 11.6 suggests that defendants may pro-
perly be characterized as fiduciaries with respect to their
appointment responsibilities regarding the Management
Committee, nothing in the OMC Health Plan suggests that
defendants were fiduciaries with respect to the investment
of the plan's assets or the plan's funding." The court held
that plaintiffs failed to state a claim because defendants
were not fiduciaries with respect to the particular activity
of funding the plan.

Plaintiffs rely on *Leigh v. Engle*, 727 F.2d 113, 133-35 (7th
Cir. 1984), for the proposition that the power to appoint and
remove members of the Administrative and Management
Committees can, in some circumstances, create a duty to
monitor the administrators' actions. The fiduciary duty to
oversee the plan administrators in *Leigh* arose from the
defendants' close relationship with, and control over, the
administrators. *Leigh*, 727 F.2d at 134-35 n.33. We con-
cluded that, though the defendants "were not obliged to
examine every action taken by [the administrators], . . . we
think that [the defendants] were obliged to take prudent
and reasonable action to determine whether the administra-

tors were fulfilling their fiduciary obligations." *Id.* at 135. This liberal standard for fiduciary status has been reiterated in several of our subsequent decisions. *See, e.g., Plumb*, 124 F.3d at 855 ("It is true that a person can become a fiduciary with respect to a particular activity even if there is no formal written allocation of the duty."); *Mutual Life Ins. Co. of N.Y. v. Yampol*, 840 F.2d 421, 425 (7th Cir. 1988) (noting "this court's consistently broad reading" of the definition of an ERISA fiduciary); *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 736 (7th Cir. 1986) ("[I]n *Leigh* we held that fiduciaries responsible for selecting and retaining their close business associates as plan administrators had a duty to monitor appropriately the administrators' action. . . . Similarly, the corporate plaintiffs here may well have some duty to monitor the actions of the plan administrator and the insurance company administering the Plan.") (citations omitted).

Plaintiffs' complaint alleges that defendants "had very specific involvement and control over the above described Committee, by their power to appoint the members of such Committee and expressly delegate certain authority and in effect allocate their members' responsibilities based on their areas of respective expertise." Though plaintiffs' allegations provide little detail about the management committee's funding decisions, we cannot say at this early stage in the litigation that plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The district court erred in holding that defendants cannot be ERISA fiduciaries with regard to funding the plan.

### III.  Conclusion

For the foregoing reasons, we REVERSE the district court's dismissal of plaintiffs' ERISA claim only insofar as it is

based on a fiduciary duty to fund the plan, REVERSE the district court's remand of the Illinois Wage Act claim, and REMAND for further proceedings consistent with this opinion.

A true Copy:

     Teste:

_____
***Clerk of the United States Court of
Appeals for the Seventh Circuit***